LittletoN, Judge,
dissenting in part:
I agree with the decision except as to the amount allowed. I am of the opinion that under Section 3 of the Lucas Act the plaintiff is entitled to recover the full amount of its loss shown herein of $309,939.21, and should not be limited by the court, under Section 3 of the Lucas Act, to the specific items making up a claim filed by plaintiff under the First War Powers Act prior to the passage of the Lucas Act.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel and the report of Commissioner Marion T. Bennett, makes findings of fact as follows:
1. The plaintiff, A. J. Spicer, is a citizen of the United States and a resident of Oklahoma City, Oklahoma. He is a graduate electrical engineer of Oklahoma University. Except for a short period in which the plaintiff taught school and managed farms, he has been engaged in the construction business since graduation from the University. As early as 1925 he operated as a partnership, under the firm name of Jones & Spicer, building roads, pipelines, and booster stations, as well as putting up buildings and doing hauling and dirt work. The plaintiff had some experience *436 in building small airports which, consisted of excavation for runways and roads prior to entering into contracts with the United States.
2.The plaintiff furnished work, supplies, and services to the United States during the period from September 16, 1940, to August 14, 1945. This activity consisted of the construction of streets, roads, runways, taxiways, aprons, and drainage of airfields in Texas, Oklahoma, and Arkansas, under the following contracts with the United States Army, Corps of Engineers:
Contract location Contract dato Contract number
Winfield, Kansas.. May 29,1942. w-957-eng-1036
Newport, Arkansas_ July
Camp Ohaflee, Arkansas.. 1942.
Perry, Oklahoma. 26,1942. w-957-eng-1303
Palacios, Texas. November
Muskogee, Oklahoma_ August 26, 1943. W-957-eng-2079
The largest of the above contracts was the Palacios Airport with a contract price of over one million dollars. The price of the airport at Winfield was just under one million dollars and the prices of the ones at Perry and Newport were approximately $400,000. The contracts at Camp Chaffee and Muskogee were in amounts of approximately $20,000 each. On these contracts the plaintiff suffered a net loss which will be more particularly described hereafter.
3. In addition to the contracts mentioned above, the plaintiff, doing business as Kanotex Construction Company, entered into contracts with the United States for the construction of auxiliary airports at Coffeyville, Kansas, which contracts were numbered W-461-eng-11678' and W-957-eng-1421 and were in the amounts of $16,406.19 and $80,575, respectively. The plaintiff, L. B. Fugitt and Carroll Johnson, all of Oklahoma City, Oklahoma, formed a partnership under the name of Kanotex Construction Company for the purpose of obtaining and performing these two contracts.
4. The plaintiff also entered into a subcontract for the grading work, construction of the base for the runways and seeding called for by the contract between F. M. Hargrave, doing business as Hargrave Construction Company, and the United States Corps of Engineers. The prime contract on *437 this job was numbered W-957-eng-l716, and was for work at tbe Woodring Field, Enid, Oklahoma, and on three auxiliary fields in the vicinity of Coffeyville, Kansas.
To guaranteee performance of the subcontract with Har-grave Construction Company, the plaintiff executed performance and payment bonds to Hargrave with the Commercial Standard Insurance Company and General Casualty Company of America as plaintiff’s sureties. Thereafter, on June 26,1943, prior to the time work under the subcontract was commenced, the plaintiff assigned his interest in the subcontract with Hargrave to L. B. Fugitt. As consideration for this assignment Fugitt assumed an indebtedness of A. J. Spicer, sole trader, d/b/a Kanotex Construction Company, in the sum of $20,988.02 to the Liberty National Bank of Oklahoma City, and agreed to relieve Kanotex of any and all liability in connection with this debt or arising from it.
On the same date as the above assignment, Mr. Fugitt, in consideration of assistance said to have been rendered by Spicer and Carroll Johnson in carrying out the subcontract, assigned one-third of any net profits to be derived therefrom to Spicer and one-third to Johnson. The instrument of purported assignment further provided that in the event of Fugitt’s inability to complete the work, Spicer and Johnson were authorized to finish the projects involved and deduct the sums due them.
The amount of alleged loss on the contract with Hargrave is not in evidence here but is involved in the claim of F. M. Hargrave, et al. v. The United States, No. 48899, pending in this Court.
5. After the plaintiff assigned the subcontract between him and Hargrave to L. B. Fugitt, the plaintiff rented to Fugitt and Johnson certain equipment for the excavation and grading. Because of losses sustained on the contract by Fugitt and Johnson, they failed to pay the plaintiff, who claims that loss of rental in the amount of $45,051.34 should be considered a part of the net loss suffered by him through the statutory period referred to in the Lucas Act. The plaintiff seeks to include this loss because the defendant asserted a counterclaim against the plaintiff for taxes which accrued in the performance of contract W-957-eng-l7l6. This counterclaim caused the plaintiff to amend Ms petition to include *438 the alleged loss on the basis that if he was liable for taxes he was also entitled to his portion of the loss. The counterclaim has since been dismissed with respect to the taxes. Further, there is no evidence of a written request for relief under the First War Powers Act before August 14, 1945, on the contract. In plaintiff’s Lucas Act claim filed with the War Department on January 25, 1947, the plaintiff stated that he made no claim for losses because his interests therein were “transferred to others,” and that, “losses sustained on those contracts are not included in the claim herein asserted.”
6. On October 26, 1943, the plaintiff filed an application for contract adjustments and relief under the First War Powers Act with the Undersecretary of War, covering the Winfield, Newport, Perry, and Palacios contracts. In this claim the plaintiff asserted that he had suffered losses on the four contracts amounting to $445,095.18. In a schedule attached to the claim this loss was stated as follows:

7. During February and March 1944, the plaintiff filed supplementary applications for relief under the First War Powers Act, 1941, and Executive Order 9001 for losses sustained on these contracts. For the first time the plaintiff, in these supplementary applications, set forth in detail the factors to which he attributed his losses in performing these contracts.
A summary of plaintiff’s First War Powers Act claims as amended by the February and March 1944 supplements on the contracts is as follows:

*439 As plaintiff made a profit on the Winfield contract and, accordingly, did not subsequently file a Lucas Act claim covering it, his claim under that contract will not be discussed at this point.
8. By memorandum dated August 24,1944, the plaintiff’s applications for relief under the First War Powers Act were forwarded by the Chief, U. S. Army Engineers, to the Director, Purchases Division, Army Service Forces, for determination. On September 14,1944, the Army Service Forces Command referred the applications to the War Department Board of Contract Appeals (BCA) “for investigation and recommendation, with appropriate supporting findings, as to what, if any, action is warranted under the First War Powers Act and Executive Order 9001.” On October 4, 5, and 6, 1944, the Board held hearings at Oklahoma City, Oklahoma, at which the plaintiff was represented by counsel and given the opportunity to present evidence in support of his claims. On the basis of the evidence thus presented, the Board, by decision dated J anuary 20,1945, recommended that the plaintiff be granted relief under the First War Powers Act and Executive Order 9001 on certain of the items contained in his claims.
BOA DECISION ON NEWPORT CLAIM
9. Extra Sand: The plaintiff contended that he had been forced to use more sand than called for by the plans and specifications in the construction of the streets and roadways, at an additional cost to him of $38,282.72. This item of plaintiff’s claim was denied for the following reasons as expressed by the Board:
The Board finds nothing in the record to indicate that the Government was in any way responsible for the contractor’s use of an alleged amount of gravel in excess of that which he anticipated. It is apparent from the record that the contractor failed to take into consideration, in estimating the amount of gravel to be used, the contingencies for loss of gravel as suggested by the Government. The contractor’s bid provided for unit price per square yard of the various types of construction in place, and the burden was upon him properly to *440 estimate the gravel necessary to complete the roads in the manner provided by the specifications.
10. Excess Grading Cost: This item of the plaintiff’s claims was based upon a diversion of five Government-owned “Euclids” by the Contracting Officer to other contractors which resulted in an alleged extra cost of moving an estimated 100,070 yards of dirt. The Board denied this claim for reasons as follows:
The rental agreement under which this equipment was returned to the contractor provided that: “This lease shall be terminable at the will of the Chief of Engineers or his duly authorized representative.” The contracting officer removed this equipment from the contractor for the reason that in his judgment other work at the project was more urgent than that which the contractor was doing, and for the further reason that at the time the Euclid wagons were taken approximately 87,000 cubic yards of excavation work was taken from the contractor and given to another contractor on the project. The Board can see no reason why the contractor has a claim either in equity or in law against the Government for this action, since it is obvious that at the time he entered into this contract there was no assurance given to him by the Government that Euclid dirt wagons would be furnished him for his excavation work. The fact that they were later furnished to him was more an accommodation than a requirement.
11. Freight on “Euclids[Regarding this item, the Board decided:
Certainly it was contemplated by both parties that the contractor would have the use of this equipment for a reasonable time, and since the Government without any fault of the contractor took this equipment from him before he had an opportunity to get any benefit from its use, he should not be expected or required to pay the freight on the equipment. The contractor’s claim appears to be just, and if it should be determined that he is entitled to relief, he should be reimbursed for this freight charge of $840.13.
12. Increased Wages: The Board decided that the specifications set minimum, wages and that the contractor could have ascertained and foreseen that higher wages would have to be paid.
*441 13. Equipment Claims: The plaintiff’s claims involve rentals paid for the nse of Government equipment and alleged excess cost of repairs to such equipment. Regarding these equipment claims the Board stated:
In view of the provisions of the rental agreement and the evidence before the Board, we are of the opinion that no good cause has been shown why the contractor should be given relief as requested for the losses he has alleged to have sustained on his equipment rented from the Government unless he is entitled to relief because of alleged violations of the OPA regulations which will be discussed hereafter.
14. The plaintiff’s position regarding the alleged violation of OPA regulations is set forth in an excerpt in plaintiff’s brief submitted to the Board of Contract Appeals and which is quoted in the BOA decision as follows:
All of the equipment was used by the contractor on a bare rental basis and the rental agreements and prices are therefore controlled by Office of Price Administration Regulation No. 1'34. Section 1399.14 thereof provides that rental rates fixed by the regulation include allowance for the cost of all repairs and overhaul required as a result of normal wear and tear of equipment, and that when equipment is on bare rental and breaks down, as a result of normal wear and tear, lessor cannot chai-ge lessee with the costs of repairs or any rental for time lost while repairs are being made.
Contrary to the regulations, the Government made charges at full OPA ceiling prices but refused to recognize the fact that those prices already included an allowance for the cost of repairs and overhaul resulting from normal wear and tear and also compelled Spicer to pay the full rental rates during the time the equipment was broken down and awaiting repairs. Thus, the Government collected from Spicer full rental rates and compelled him to assume the burdens of ownership, which in fact was the obligation of the Government.
Under these circumstances, Spicer is entitled to reimbursement in the sum by which the repair cost and rental charges exceed the amount which would represent the full ceiling prices authorized by the OPA regulations.
*442 15. The Board agreed with the plaintiff in this regard and, in conclusion, recommended that the contractor be afforded the following relief on the Newport contract:
1. For the reasons previously stated, it is the opinion of the Board that the interpretation as placed upon its regulation by the OPA should be controlling upon other agencies of the Government in the absence of an authoritative court decision to the contrary, and, therefore, the contractor should be reimbursed for his cost of repairs due to normal wear and tear of Government equipment and for the rental charged him during the time such repairs were being made.
2. It is the further opinion of the Board that the contractor should be reimbursed for his cost of repairs and any rental charged on equipment which was not in working condition when received by him from the Government (the Board cannot determine the amount from the present record).
BOA DECISION ON PERRT CLAIM
16. As in the Newport claim, most of plaintiff’s losses on the Perry contract were attributed by the plaintiff to excess rental rates and repair costs to Government-owned equipment. The Board, in its decision, discussed these claims together and, on the basis of the evidence presented, recommended that the plaintiff be afforded the following relief on the Perry contract:
1. The Board makes the same recommendation herein as was made in the findings and recommendation under the Newport, Arkansas, project relative to the contractor’s right to relief due to the alleged violation by the War Department of OPA regulations incident to execution and enforcement of the equipment rental agreement herein (the Board cannot determine the amount from the present record) ;
2. The contractor is entitled to reimbursement of the rental charged him in the use of excessive equipment, as described in the Board’s findings herein, during the time which he was not actually using it, due to a special arrangement relative to its use, as has been more fully discussed above in the findings of the Board (the Board cannot determine the amount from the present record);
3. The contractor is entitled to reimbursement for the transportation costs of this excessive equipment as above set forth in its findings of the Board herein (the Board *443 cannot determine the amount from the present record);
4. The contractor is entitled to reimbursement in the amount of $7,049.72 for an increase in the rate charged on equipment from 90 percent OPA maximum rate to 100 percent OPA maximum rate ;
5. The contractor is entitled to relief from rentals charged on equipment awaiting release for all the time in excess of one day due to delay in inspection (the Board cannot determine the amount from the present record); and
6. The contractor is entitled to be reimbursed for his cost of repairs and any rental charged on equipment which was not in working condition when received by him from the Government (the Board cannot determine the amount from the present record).
BOA DECISION ON PALACIOS CLAIM
17. Excess Subbase Cost: The plaintiff claimed that he was put to excess expense as a result of his inability to obtain “subbase” material at the principal tract indicated on the drawings. The Board said:
* * * In this connection, the record indicates that some of this sand was used by the contractor in the subgrade. If an allowance for the overhaul in obtaining the sand should be made, it should not include any payment for overhaul on the sand used in the subgrade. _ _ .
_ _ The contractor’s claim for additional cost in obtaining the sand other than the overhaul above discussed does not appear to be a cost over and above that which the contractor would apparently have had to expend even had he obtained the sand from the principal tract indicated on the drawings.
18. Equipment Claims: Regarding the plaintiff’s equipment claims at Palacios the Board concluded:
The Board is of the opinion that the costs which the contractor sustained relative to the Government equipment, other than those costs of repair and rental of equipment which was not in working condition at the time of its receipt, were not costs out of line or unreasonable with the costs which the contractor had experienced on his other war contracts or costs which he was not obligated by his rental agreement to assume and to which he should have given consideration in estimating the cost of work and in making his bid. Since his losses on the equipment are due to his apparent failure *444 to consider these elements of cost in estimating his bid, which costs he could have easily ascertained or should have known from his own experience, the Board is of the opinion that he is not entitled to relief under the First War Powers Act nor under Executive Order No. 9001 for any of those costs except for the cost of repairing and rental charged on equipment received in unworkable condition and on which he had to make repairs.
The contractor in his claim under this contract for relief has also asked for relief for the overcharge on equipment in violation of the OPA regulations. This question has been fully discussed by the Board in the Newport, Arkansas, project claim and will not be further discussed herein. If it is determined that the contractor is entitled to relief from this alleged overcharge on the Newport, Arkansas, project then he should also be given relief for such excess charges under this contract now being considered.
19. In conclusion, the Board recommended that the plaintiff be afforded the following relief on his Palacios claim:
1. Cost of overhaul of subbase sand, the amount to be determined in accordance with the Board’s findings (the Board cannot determine the amount from the present record);
2. Rental on equipment in excess of OPA regulations as interpreted by the OPA, if it is determined to follow the OPA regulations as interpreted by them (this feature of the contractor’s claim has been fully discussed by the Board in its findings and recommendation under the Newport, Arkansas, project, and such findings and recommendation are equally applicable to the claim under this contract) (the Board cannot determine the amount from the present record);
3. Reimbursement for the increase in the rate charged on equipment from 90 percent OPA maximum rate to 100 percent OPA maximum rate (the Board cannot determine the amount from the present record); and
4. Cost of repairs and any rental charged on equipment delivered to the contractor not in working condition and which the contractor had to repair before it could be used (the Board cannot determine the amount from the present record).
20. Regarding the disposition of the above claim, the BCA concluded:
Although the contractor in his request for relief under the First War Powers Act and Executive Order *445 No. 9001 has listed only three prime contracts, it is apparent from his claim that he is also seeking relief under the three equipment rental agreements which he entered into with the Government for equipment used in connection with the work under the prime contracts. The Board has, therefore, considered his request for relief under these rental agreements the same as if he had specifically requested it in his application.
The Board has been unable to determine and recommend definite amounts in most of the instances where recommendation for relief has been made. To have determined the amounts would have required a delay in making the recommendation since it would have been necessary to have obtained additional evidence and to have had the accounts audited.
The Board accordingly recommends that the contractor’s request for relief under the First War Powers Act and Executive Order No. 9001 be granted on the items as set forth in the recommendations herein.
21. By memorandum dated April 16, 1945, the Director, Purchases Division, Army Service Forces, directed the Chief, Army Engineers, to grant the plaintiff relief in accordance with the following directions:

Newport Contract

a. The Contractor was entitled to be furnished, under his equipment rental lease, with Government-owned equipment which was in working order. Nevertheless, there were furnished to him certain items which could not be used unless repairs were made at his own expense. The Contractor should be reimbursed for (1) the cost of repairs necessary to place such items in working order, and (2) rental charged on such items during the period before they were placed in working condition, regardless of whether the sum of the repair costs plus the stated rent exceeded the maximum OPA rental. Neither the Board of Contract Appeals nor this office is able to determine the items of such equipment, the improper rentals collected, or the cost of repairs made by the Contractor. Under the authority delegated in paragraph 8 of this memorandum, the Chief of Engineers, or his representative, will determine such amount. There should be included in such amount appropriate sums representing the applicable share of (1) the cost of repair parts, (2) the cost of labor employed in performing repairs, (8) the insurance cost on mechanic payroll, and (4) improper rental charges.
*446 5. (1) This office is of the view tbat, under tbe applicable OPA regulations as interpreted by. the Office of Price Administration, and under the particular circumstances of these cases, the Contractor should not be required to bear the cost of repairs of Government-owned equipment due to normal wear and tear. For the purposes of relief under the First War Powers Act,, it is considered that the most appropriate and equitable measurement of such excess costs is furnished by the provisions added to Maximum Price Regulation 134 by Amendment 13, effective 30 November 1943. This Amendment provided that the lessor of equipment could cast upon the lessee the burden of making repairs due to normal wear and tear, if no more than 85 percent of the maximum rental was charged by the lessor. Although these provisions were not in effect during the life of the subject contracts, this office is informed by the Office of Price Administration that the “admeasurement, in Amendment 13, of the value of wear and tear repairs at 15 percent of the applicable maximum bare rental price was based upon cost experiences of the Corps of Engineers, and of the Bureau of Yards and Docks over many years,” and that the establishment of this rule in the price regulation expresses the view of OPA that it represents a fair and reasonable approximation of the costs of fair wear and tear repairs.
(2) Accordingly, the Chief of Engineers, or his representative, will determine, under the authority delegated in paragraph 8 hereof, the sums paid by the Contractor for rentals m excess of 85 percent of the applicable OPA maximum rentals; the total of such sums will represent appropriate equitable relief to the Contractor, under the First War Powers, on these items of his applications.
c. The Contractor is also entitled to be reimbursed, in the amount of $840.13, for freight charges borne by him on five Government-owned Euclid dirt wagons which were recalled by the Government after very short periods of use by Spicer. It is believed that this item of the claim is within the reservation contained in the Contractor’s release.

Perry Contract

a. The Contractor should be reimbursed for repair costs incurred and rentals paid on Government-owned equipment which was not furnished to him in working-order, in the manner indicated in paragraph 5a above. The amounts will be determined by the Chief of Engineers, or his representative.
*447 5. The Contractor should be reimbursed for excess rental charges paid on Government-owned equipment in the manner indicated in paragraph 55 above. The amounts will be determined by the Chief of Engineers, or his representative.
g. It appears from the file that most, if not all, of the Government-owned equipment moved by the Contractor from the Winfield, Kansas area to the Perry, Oklahoma area was moved pursuant to an understanding that the Contractor would be charged no more than rental for the periods during which he was using such equipment on the Perry project, and that he would not be charged the cost of transporting such equipment from Perry to Tulsa, or elsewhere.
(1) The Contractor should be reimbursed for the rental charged him with respect to the periods during which he was not using such equipment on the Perry project on those items of Government-owned equipment moved by him from the Winfield, Kansas area to the Perry, Oklahoma area, pursuant to the understanding that he.would be charged nothing more than rental for the periods during which he was using such equipment on the Perry project.
(2) The Contractor should also be reimbursed for the following.transportation charges: (a) charges incurred.in moving, from the Winfield area to Perry, items of equipment which he did not himself use at the Win-field project; and (b) charges incurred in moving, from Perry to Tulsa (or elsewhere), items of equipment brought by the. Contractor from Winfield pursuant to the understanding that he would be charged nothing more than rental for the periods during which he was using such equipment on the Perry project.
(3) This office is unable to determine from the file the items of equipment included within the aforementioned understanding. Under the authority delegated in paragraph 8 hereof, the Chief of Engineers, or his representative, will determine the particular items involved and the amounts of the improper rentals and transportation charges.
d. The Contractor should be reimbursed (without duplication of amounts otherwise reimbursed hereunder), m the sum of $7,049.72 for increased rentals paid on Government-owned equipment as a result of the increase in the rental rate from 90 percent of the OPA maximum rate to 100 percent thereof. It is believed that relief should be awarded in this instance since the increase occurred on 16 October 1942, some three weeks after the *448 subject contract was entered into, on 26 September 1942.
e. Reimbursement should be allowed for. rentals charged on Government-owned equipment awaiting inspection and release for all time in excess of two (2) days after the expiration of the notice period for release of equipment required by the contract or the accompanying equipment lease to be given to the Government by the Contractor. The amount of these excess rentals cannot be determined from the file. Under the authority delegated in paragraph 8 hereof, the Chief of Engineers, or his representative, will determine such amount.
/. It is not believed that the Contractor has shown himself entitled to any other items of relief requested, including the sum requested on account of “loss which cannot be broken down.”

Palacios Contract

а. The Contractor should be reimbursed for repair costs incurred and rentals paid on Government-owned equipment which was not furnished to him in working order, in the manner indicated in paragraph 5 a above. The amounts will be determined by the Chief of Engineers, or his representative.
б. The Contractor should be reimbursed for excess rental charges paid on Government-owned equipment in the manner indicated in paragraph 5 5 above. The amounts will be determined by the Chief of Engineers, or his representative.
c. It is not believed that the Contractor should be reimbursed either for the alleged increased cost of sand or for the asserted over-haul of the sand. No representations were made to the Contractor as to the availability of sand near the project, and it was his ordinary responsibility to determine such facts prior to making his bid.
d. In this case, the Contractor is not believed to be entitled to reimbursement for increased rentals paid as a result of the increase in the Government’s rental rate from 90 percent of the OPA maximum rate to 100 percent. The increase was promulgated on 16 October 1942, the construction contract was not entered into until 11 November 1942, and the equipment rental lease was dated 25 January 1943. It was the normal duty of the Contractor, upon undertaking a new contract, to inquire as to the Government’s current rates. The denial of this item of Contractor’s claim does not affect excess rentals which may be determined pursuant to paragraphs 7 a or 7 6 above.
*449 e. Other costs of repair alleged to have been incurred in connection with Government-owned equipment should not be reimbursed. Such “losses” were apparently due to the Contractor’s failure to consider foreseeable costs in making his original bid, and the Government has no responsibility therefor. Nor is it believed that the Contractor has shown himself entitled to any other items of relief requested, including the sum requested on account of “loss which cannot be broken down.”
The memorandum concluded:
b. It is recognized that difficulties of auditing and assessing costs may be involved in making the determinations required by this memorandum. This office does not object to the negotiation by the Corps of Engineers of a reasonable settlement of the matter within the general framework laid down herein. Authority is hereby granted to the Chief of Engineers, or his representative, to negotiate such a settlement with the Contractor; the contract or agreement made pursuant to such settlement is to be made subject to the approval of the Director, Purchases Division. In no case, however, should the amount of a determination made by the Chief of Engineers, or his representative, as to any item of relief, or the amount of a negotiated settlement with respect to any item of relief, exceed the amounts claimed by the Contractor on the individual items of relief for which reimbursement is granted. It is to be understood that this office expresses no view whatever as to the propriety of the amounts claimed by the Contractor on the items for which reimbursement is to be granted.
22. The Corps of Engineers determined an amount which it considered the plaintiff should receive in settlement of his request for relief under the First War Powers Act and Executive Order 9001. The plaintiff was told that if he did not accept the amount in settlement of his claims that the matter would be referred to the General Accounting Office for further action. Due to the imminent insolvency of the plaintiff, he felt he had no alternative but .to accept the amount offered in settlement of his claims, for which he gave releases.
23. To effect the settlement, the plaintiff entered into supplemental agreements with the Army Engineers covering the Winfield, Newport, Perry and Palacios contracts, these *450 agreements being of the same form as the following agreement which covered the Newport claim:
This supplemental agreement entered into this third day of July 1945, by and between the united states oe ameRIoa (hereinafter called the Government) represented by the Contracting Officer executing this agreement, and A. J. Spicer, an individual of the City of Oklahoma City, in the State of Oklahoma (hereinafter called the Contractor), witnesseth that:
Whereas, on the 2d day of July 1942, the parties hereto entered into Contract No. W-777-eng-1322 as modified for construction of cantonment streets, roads, and grading for the Air Force School near Newport, Arkansas; and
"Whereas, it has been determined that the execution of this supplemental agreement will facilitate the prosecution of the war; and
Whereas, this supplemental agreement is executed pursuant to the First War Powers Act, 1941, and Executive Order No. 9001:
Now, therefore, said contract is hereby modified in the following particulars, but in no others:
The contract commitment is hereby increased in the amount of $38,812.78, and the Government agrees to pay to the Contractor the said sum of $38,812.78 in addition to all other sums due and previously paid under this contract.
The Contractor hereby agrees that upon payment to the Contractor of the amount herein provided, the Government will be released and discharged from all further claims and demands whatsoever arising under or by virtue of said contract or otherwise relating to the work performed thereunder, including claims and appeals which may have been heretofore made or are pending and upon which payment has not been made to the Contractor.
The Contractor is not required to obtain additional performance and/or payment bonds. However, there is included in the consideration of this modification agreement a sum to cover such additional premiums as the surety may charge for spreading the risk under the original bond or bonds to this modification agreement. Such performance and/or payment bonds, as were required to secure the contract modified hereby, shall bond and secure the work or change herein provided for to the same extent and in the same manner as the work provided for under such contract as heretofore *451 modified. The obligation of the surety is limited to the amount of the penalties of such bond or bonds.
All other terms and conditions of said contract as it heretofore may have been modified shall be and remain the same.
24.On the “basis of these supplemental agreements the plaintiff received the additional sum of $174,655.46, this amount being allocated to the four contracts, as follows:
Winfield_$37,422.71
Newport_ 38, 812.78
Perry_ 40,045.20
Palacios_ 58,374.77
Total_ 174,655.46
25. On January 25,1947, the plaintiff filed an application and claim for relief under the Lucas Act. This application consisted of an introduction to which were attached plaintiff’s 1944 supplemental First War Powers Act claims on the Newport, Perry, and Palacios contracts. In the introduction the plaintiff states that his net over-all losses amounted to $370,066.60. Elsewhere the figure $379,972.14 is used.
The plaintiff asserted in his February and March 1944 supplemental War Powers Act claims that his losses on the Newport, Perry, and Palacios contracts amounted to $412,079.73. The plaintiff subsequently received First War Powers Act relief on these three contracts amounting to $137,232.75. Thus, it would be supposed that plaintiff’s losses on the three contracts would have then dropped to $274,846.98. However, in plaintiff’s Lucas Act claim, he claimed net over-all losses in the amount of $370,066.60 (or $379,972.14), after crediting First War Powers Act relief. In the plaintiff’s amended petition he claims a net loss on all of his contracts and subcontracts in the sum of approximately $725,000. The sums established as net losses by the evidence, whether or not allowable, aggregate $438,565.76, in addition to previous relief granted, and are as set forth in findings 5,27, 28, and 29 and claimed here by the plaintiff as having been incurred without plaintiff’s fault or negligence.
26. On July 10, 1947, the Chief, Army Engineers, denied *452 plaintiff’s claim for tbe reason given that Paragraph 204 of Executive Order 9786 precludes recovery on any claim upon which final action had been taken by the agency involved prior to August 14, 1945. On July 31, 1947, the War Hardship Claims Board dismissed the plaintiff’s claim for the same reason.
27. In order to collect the sums set forth in finding 24, under the First War Powers Act, the plaintiff found it necessary to employ attorneys. The plaintiff incurred the cost of attorney’s fees and expenses in connection with their services in the total sum of $43,685.48. These legal fees and expenses were incurred after completion of the contracts and solely in connection with obtaining the adjustment in equipment and rental rates and related equipment charges which were in excess of the maximum allowed to be charged by Maximum Price Eegulation 1'34 and Section 1399.14 of OPA Regulations and withheld by the defendant from plaintiff’s pay estimates. The attorney’s fees and costs were reasonable. The plaintiff claims said sum in this action.
28. During the construction period it became necessary for the plaintiff to borrow almost half a million dollars from the Liberty National Bank of Oklahoma City. This was especially necessary for the Palacios job, where he sustained a big loss and was unable to pay his bills. The plaintiff paid interest at the rate of 6 percent per annum to the bank, which was reasonable at the time. The plaintiff incurred and became obligated to pay interest in the amount of $39,-889.73 which accrued between September 16, 1940, and August 14,1945. During the period the plaintiff was engaged in the construction work, he paid $7,588.48 to the Liberty National Bank as interest. It was necessary to borrow the money, due in large part to the excessive equipment rental charges by the defendant which were withheld from plaintiff’s pay estimates, thus causing a shortage of capital. The plaintiff claims the cost thereof is thus an indirect cost of performing the contracts and recoverable here.
29. Exclusive of attorney’s fees and interest cited above, which are in controversy here as to whether they are allowable as a matter of law, it is agreed between the parties that the actual net construction loss incurred by the plaintiff *453 during the periods of performing the contracts involved in this suit, amounted to $309,939.21 in excess of the amount paid to the plaintiff pursuant to relief granted under the First War Powers Act. The Court in A. J. Spicer v. The United States, 113 C. Cls. 267, in overruling the defendant’s motion to dismiss, held that payment pursuant to Section 201 of the War Powers Act of 1'941 and Executive Order 9001, and releases given to the defendant in consideration of the payment, were no bar to relief under the statute.
30. The Government, since the hearing before the Commissioner of this court, no longer asserts that there was fault or negligence in the performance of the Newport or Perry contracts. The facts as they pertain to fault or negligence in the performance of the Palacios contract are next considered.
31. On November 11,1942, the plaintiff entered into a contract with the United States Army Engineers, Galveston District, for the construction of runways, taxiways, apron and drainage facilities at the Air Support Command Base at Palacios, Texas. This contract required the plaintiff to excavate an estimated 779,400 cubic yards of dirt, the laying of an estimated 320,621 square yards of select material sub-base, six inches thick, and the pavement of runways, taxiways and aprons which involved an estimated 320,621 square yards of concrete. Aside from the field drainage facilities consisting of concrete piping running from catch-basins located at intervals along the sides of the runways, the contract also required the plaintiff to construct a perimeter drainage ditch running around the northern borders of the airfield. The purpose of this perimeter ditch was to intersect two natural draws, one of which entered the airfield site from the north, and the other from the east. Both of these natural draws intersected and flowed into the construction site and off to the southwest, to drain into the Gulf of Mexico which was adjacent to the airfield site.
32. The plaintiff’s bid for this work amounted to $1,063,-836.48. The next lowest bid on the contract amounted to $1,304,113.54. The Government’s estimate of the cost of the contract work, and not including profit, amounted to $1,248,-746.99. When the bids were opened and it was apparent *454 that the plaintiff’s bid was $240,277.06 lower than the second low bidder, and $184,910.51 lower than the Government estimate, Captain Kenneth Heagy, Chief of the Engineering Division, Galveston District, called the plaintiff and pointed out the differences. Captain Heagy pointed out that the whole difference between the plaintiff’s bid and the others was included in the bids on Items 1 and 2, the excavation and the subbase. The plaintiff’s aggregate bid on Items 1 and 2 was $255,824.94 as compared with $490,031.04 and $666,-797.14 for two other bidders, respectively, and $491,750.81 for the Government estimate. At this meeting between the plaintiff and Captain Heagy, which took place sometime between November 4, 1942, the day the bids were opened, and November 11,1942, the day the contract was signed, the plaintiff was given a chance to withdraw his bid. The plaintiff insisted he could do the work for his bid price and elected to go on with the contract.
33. The plaintiff bid low on Items 1 and 2 for three main reasons. First, he had just profitably completed a large dirt-moving contract at Winfield, Kansas, and thought that he had an organization which was superior to others and more efficient. Second, he wanted to obtain his first contract from the Galveston District. Third, he wanted to get a job in order to keep his organization together over the winter months. The plaintiff purposely made his bid low on the excavation and subbase for these reasons, and, in fact, figured no profit in his excavation bid. When the contract was completed, the plaintiff’s entire loss was suffered on these two items which he purposely bid low.
34. The New Amsterdam Casualty Company was the plaintiff’s surety. On December 4, 1942, the surety wrote the following letter to the Galveston District:
We have been asked to execute Performance and Payment Bonds on behalf of the above contractor, covering his contract of $1,063,836.48, for grading and concrete paving of runways, taxiways, and apron, and for drainage work at the Air Support Command Base, Palacios, Texas.
Mr. Spicer’s bid is about 1714 percent lower than the Engineer’s estimate for this work, and is about 22% percent lower than the second bidder. To our way of *455 thinking, this is quite a large discrepancy in bids, but we feel sure that there is a logical explanation of it. We have been advised that the substantial amount in the difference in bids is accounted for by a change in the specifications whereby top soil was to he used and could be secured from a site adjoining the location of this contract rather than sand which had to be hauled in. We have been advised that you are fully acquainted with this matter, and we are wondering just what information you can give us as to the difference in bids on this contract.
35. On December 15, 1942, Captain Heagy replied to the surety as follows:
Reference is made to your letter of December 4 addressed to Captain M. F. Martin concerning the contract amounting to $1,063,836.48 which Spicer, Inc., holds for grading and concrete paving of runways, taxiways, and apron and for drainage work at the Air Support Command Base, Palacios, Texas.
As stated in your letter, the total offer amount of Spicer, Inc., is about 17 percent lower than the Government Engineer estimate for this work and about 22 percent lower than the offer submitted by the second low offerer. This difference lies mainly in two bid items. Spicer, Inc., is 11 cents lower than the Government estimate for Bid Item No. 1 — Excavation, for which Spicer, Inc., bid 27 cents and the Government estimate is 38 cents, and 47 cents lower than the Government estimate for Bid Item No. 2 — 6-Inch Subbase, for which Spicer, Inc., bid 14. cents and the Government estimate is 61 cents. The wide spread between bid item amount and Government estimate on Bid Item No. 2 cannot be accounted for by change in the specifications since the Government estimate was also prepared on the basis of a change in the sources of material.
In the particular area in which this contract work is located, Spicer, Inc., may encounter rainy and wet weather during the contract period which could increase their cost on these two items materially. It is the opinion of this office that their offer is in line on . all other bid items.
This office is of the opinion that the Government estimate is a fair and reasonable price for doing the work covered in the contract with Spicer, Inc., and that this estimate is based on performing this work under normal weather conditions. This office is of the opinion also *456 that if Spicer, Inc., encounter perfect weather conditions they can construct this project for the prices they have bid and enjoy a fair profit.
At the time that the offers for this construction at Palacios were received, Captain Heagy reviewed the Government estimate with Mr. Spicer, and although Mr. Spicer was fully aware of these differences, he expressed his willingness to contract for this work at his bid prices.
To date, Spicer, Inc., have experienced extremely favorable weather conditions on this project, and due to rapid organization of personnel and plant on the job they have completed sufficient excavation and subbase construction so that the construction of the concrete work probably will be initiated this week.
If this is still a matter of concern to you, it is suggested that you send a representative to the site of the work to discuss this matter further with the Government Engineer in Charge and the superintendent of Spicer, Inc.
36. The information contained in Captain Heagy’s letter concerning the plaintiff’s bid was obtained from a memorandum prepared by Mr. James C. Wason, an experienced estimator who had prepared the Government’s Palacios contract. This memorandum stated as follows:
1. I have reviewed Mr. Spicer’s bid and the government estimate for the above-mentioned project, and I find that Mr. Spicer is eleven cents lower than the government estimate for Bid Item No. 1 — Excavation, having bid twenty-seven cents for which the government estimate is thirty-eight cents; and forty-seven cents lower than the government estimate for Bid Item No. 2 — 6-Inch Subbase, having bid fourteen cents for which the government estimate is sixty-one cents. I believe that the entire difference can be accounted for because of Mr. Spicer’s lack of familiarity with weather conditions which are liable to prevail during the period of construction. In this particular area, he may encounter rainy and wet weather which will merely double his costs on these two items, especially Item No. 2. One contractor who has worked in this area in recent years told me that on a paving project which he was constructing, he had one period of sixty-five days in which he could not work because of this factor. If Mr. Spicer encounters this type of weather, he cannot possibly put in the subbase for twice the price which he has bid. In other respects, I believe his bid is in line.
*457 2. Therefore, I find it very hard to justify Mr. Spicer’s bid as these conditions were all taken into account in preparing the government estimate, and I believe that this estimate is a fair and reasonable price for doing this work. If he encounters perfect weather conditions, he can build this project for the price he bid, but I do not think it can be built for this price under adverse weather conditions.
37. The plaintiff’s losses on .the Palacios contract were $261,533.97, as set out in his Lucas Act claim. The difference between the plaintiff’s bid of $255,324.94 and Mr. Wason’s estimate of $491,750.81 on Items 1 and 2, amounts to $236,425.87 of the total loss claimed by the plaintiff. As to Item 2 standing alone, however, the defendant’s estimate was high. The defendant estimated six-inch subbase at 61 cents for a total of $195,578.21. The plaintiff bid 14 cents for a total of $44,886.94. Other bidders were at 24 cents and 34 cents. The plaintiff’s actual cost was 19.7 cents for a total of $67,099.62.
Mr. Wason, in making the defendant’s estimate, gave consideration to the rain conditions which he felt could be expected to occur in the Palacios area on the basis of past official weather reports. He also considered, as part of his costs, an allocation for repairs to equipment of 20-25 percent of the total rental value of all equipment used, instead of the usual 5 percent allocation for repair costs. The greater allocation was used in order to compensate for wartime conditions which made getting parts and new equipment more difficult.
38. In making up his estimate on the cost of Item 2, the select material for the subbase, Mr. Wason visited the proposed sites for such select material as described in a soils report prepared by the Engineers and available to prospective bidders at both the project site and the district. This soils report was referred to on the first page of the contract specifications as follows:
A-02. Investigation of Conditions. — The bidders shall visit the site and acquaint themselves with all the information as to the nature of the materials that will *458 be encountered; tbe local conditions having a bearing on the transportation, handling, and storage of materials; and any other information that may in any manner affect their bid. Investigations of the soils and foundation conditions at the site and its vicinity have been made and a report is on file at the TJ. S. Engineer Office at Galveston, Texas, and also at the office of the Engineer-in-Charge at the site of the work. Offerers will be permitted to refer to these reports. Failure to acquaint himself with all information concerning these conditions will not relieve the successful bidder of assuming all responsibility for estimating the difficulties and the costs of successfully performing the complete work as required. * * *„
The soils report referred to, at page 78 thereof, had a diagram which graphically indicated the sites of the proposed deposits of select materials.
39. The plaintiff incurred increased costs in furnishing the select material for the subbase due to the fact that he was not able to obtain the material from the area designated by the defendant.
The specifications advised the plaintiff with respect to where the materials could be found and the pertinent provision was as follows:
2-10. Selected Material Swbbase. — (a) The material for the subbase shall be local sandy material obtained from areas within the field or from other areas designated by the contracting officer, and shall have a P. I. of 12 or less, and shall be free from lumps of clay, vegetation, or other objectionable matter.
At the time the plaintiff’s representatives visited the site they were shown a plat prepared by defendant’s representatives designating the location of an area from which the select material could be procured and also showing the core borings that had been made on the site to determine the quantities and quality of the available material.
The plaintiff was later advised that the material in the designated area met the proper P. I. test. After the plaintiff entered into the contract, he learned that defendant’s representatives had made no arrangement with the owner of the land for obtaining the select material before they tested it *459 and informed him that he could obtain the material from that designated area and that it met the test.
The plaintiff was unable to locate the owner and as a result had to procure the material from other sources. The material was found at several different areas, a distance of from two to five miles from the field, which increased his costs and caused him to suffer a loss in preparing the subbase.
40. The plaintiff’s costs were increased by the unusually severe weather which he could not anticipate occurring during his construction period. At times it caused a complete stoppage of work, which slowed or severely handicapped the production of the excavation.
The plaintiff’s construction operations were closed down because of rain, wet grounds or freezing weather on the following days:
Dec. 11,1942
Dec. 22-31,1942, incl.
J'an. 1-3, 1943, incl.
Jan. 6-16, 1943, incl.
Jan. 19-20, 1943
Jan. 24r-27, 1943, incl.
Feb. 1, 1943
Feb. 5-6,1943
Feb. 18-23,1943, incl.
Mar. 3-7, 1943, incl.
Mar. 16,1943
Mar. 19, 1943
Mar. 24-28,1943, incl.
Apr. 17-18, 1943
May 23-24,1943
May 29-31,1943, incl.
June 13, 1943
The United States Weather Bureau reports that below freezing temperatures occurred at Palacios, Texas, on the following dates:
January 19,1943-. 20.0 degrees
January 20,1943_ 20.0 degrees
January 26, 1943_ 27.0 degrees
January 27,1943_. 29.9 degrees
January 28, 1943-28.5 degrees
February 11,1943. 31.0 degrees
March 2,1943_ 32.0 degrees
March 3,1943_ 23.9 degrees
March 7, 1943_ - 29.8 degrees
Special provisions of the contract specifications advised the plaintiff as to weather, as follows:
B-6. Temperature Zone. — The temperature zone for this project is hereby designated as plus thirty (30) degrees. Construction methods shown on the drawings *460 for plus thirty (30) degree zones will apply for this contract.
Between December 21, 1942, and March 26, 1943, which is a period of 96 days, the plaintiff could work only on about 52 days and had delays in work equal to 60 days.
41. The defendant protested plaintiff’s rate of progress but eventually recognized the fact that the plaintiff encountered unseasonable rain, wet ground, and freezing temperatures, beyond that which he could reasonably expect, and extended the contract period 60 calendar days for completion because of such conditions. The modification dated August 4,1943, signed by the contracting officer, is as follows:
Eeference is made to Article 9, and to Paragraph B-4 (b) of the specifications to and forming part of your Contract No. W-359-eng-4983 for construction of runways, taxiways, apron and drainage at the Air Support Command Base, Palacios, Texas.
Delays in the prosecution of the work under said contract equivalent to one hundred and thirty-four (134) calendar days during the period of 21 December, 1942 to 27 June 1943, inclusive, were encountered. The causes and periods of time of such delays are as follows:
1. Delays were encountered equivalent to sixty (60) calendar days, during the period 21 December, 1942 to 26 March 1943, inclusive, due to unseasonable rain and wet grounds and freezing temperatures beyond that which could reasonably be expected.
2. Delays were encountered equivalent to fifty (50) calendar days, during the period 1 February to 15 May 1943, inclusive, due to nondelivery of sand and gravel caused by breakdowns at the gravel plant and a shortage of railroad cars, and to nondelivery of essential equipment repair parts, caused by operation of the priority system.
3. Delays were encountered equivalent to twenty-four (24) calendar days, during the period of 1 May 1943 to 27 June 1943, due to an overrun of field blading of 142 percent, and further to the fact that considerable field blading was delayed by the Government until grading operations were completed in order that a more finished and satisfactory job could be obtained.
Since none of the aforementioned delays were concurrent, and as notice of the delays was given by you in accordance with Article 9 of said contract, it has been determined that it is necessary and in the best *461 interest of the United States to modify said contract in certain particulars as follows:
The contract period in which to complete the work under said contract shall be extended one hundred and thirty-four (134) calendar days.
There is no change in the amount of the contract provided for by this change order.
It is understood and agreed that all other terms and conditions of said contract, as it heretofore may have been modified, shall be and remain the same.
Therefore, if the foregoing modification of said contract is satisfactory, please note your acceptance thereof in the space provided below.
* * * * *
Dated: August 12,1943.
The foregoing modification of said contract is hereby accepted.
AlleN JoRdan Spicer, Individual.
By (S) A. J. Spicer.
Title: Owner.
Two witnesses:
(S) C. M. Davenport.
(S) C. A. Phillips.
42. The unusual amount of rainfall in the area and its effects were beyond the plaintiff’s control. The rain caused the soil to become extremely difficult to work, waterlogged the area and left water standing all over the field. This condition caused the equipment the plaintiff was using, which was already badly worn, to break down repeatedly and slow up the operations. It reduced the production of the excavating and hauling equipment. The defendant’s inspectors required the plaintiff to reduce the loads hauled by the trucks by requiring him to remove the end-gates and sideboards. In the excavating area the tractors became mired down and it was necessary to keep a crew in operation to dig them out. The mud would cling to the wheels and tracks of the excavating equipment, stopping their progress and necessitating the employment of laborers to remove the mud from the wheels and tracks of the equipment. During the period of inclement weather some few items of equipment worked intermittently.
*462 43. In addition to being thrown behind in his work because of the inclement weather, the plaintiff sustained a loss because of the fact that he was charged rentals on the equipment during all of the time it was down because of the inclement weather. The plaintiff therefore obtained no benefit from the equipment during the time it was idle.
The equipment was idle 45 perceii t of the time. The plaintiff was charged rentals at the maximum OPA rates.
44. Prior to the awarding of the contract to the plaintiff, the defendant made a thorough investigation of the plaintiff to assure itself of his ability to perform the contract and as to the amount of equipment he had available to use on the pro j ect. The defendant also investigated his financial standing through the Liberty National Bank of Oklahoma City. The Galveston engineers communicated with the representatives of the defendant at Tulsa, Oklahoma, on the investigation. The latter advised them that the plaintiff would not be permitted to remove his equipment from those jobs.
The defendant knew that the plaintiff did not have sufficient equipment of his own and was so advised by a telegram from the Tulsa District Engineer, as follows:
REURTEL NOVEMBER 4 A. J. SPICER HAS PERFORMED CONSIDERABLE WORK FOR THIS DISTRICT AND IS NOW ENGAGED IN AIRFIELD GRADING. HAS CONSIDERABLE EQUIPMENT AND ALSO IS RENTING CONSIDERABLE GOVERNMENT-OWNED EQUIPMENT. NO FINANCIAL DIFFICULTIES INVOLVED. MAINTAINS SCHEDULES SATISFACTORILY AND IT IS THE OPINION OF THIS OFFICE THAT HE CAN HANDLE PROJECT REFERRED TO PROVIDED HE IS ABLE TO FINANCE.
45. On November 7,1942, and prior to the time the plaintiff entered into the contract, he had a telephone conversation with Captain Heagy and Mr. James Simpson, the latter being in charge of equipment for the Galveston District. The purpose of the conversation was to ascertain what equipment the plaintiff had available for the job and also what equipment he could obtain from the Government. In this conversation, the plaintiff asserted that he had certain equipment available immediately for work at Palacios. He stated this equipment consisted of two one-yard draglines and clamps, one %-yard dragline and clamp, two 28-inch x 50- *463 inch ditchers, four sets of rollers and tractors, one paver, four bulldozers, four 12-yard scrapers and one 48-inch elevating grader. The remainder of the conversation related to what equipment the plaintiff might obtain from the Government. It was agreed that the plaintiff would furnish the Engineers with a list of equipment he would need.
46. On November 9,1942, Captain Heagy received the following letter dated November 7, 1942, from the plaintiff:
The following is a list of the equipment that we would like to lease from the Government Pool for the Palacios Job:
8 or 10 12-Yd Scraper Units with Tractors,
2 D-8 or the equivalent Push Cats,
10 to 20 Dump Trucks,
2 or 3 sets of Sheepfoot Rollers,
1 iy2-Yd or 1%-Yd Dragline.
During the performance of the Palacios contract the Government furnished the plaintiff substantially more equipment than was contained in the plaintiff’s written request of November 7,1942. He rented approximately 176 additional pieces of equipment including concrete forms. The plaintiff complained that much of his loss at Palacios was due to delay and high repair costs caused by the poor operating condition of some of this equipment, in particular, some White dump trucks.
47. The plaintiff initially received about 20 of these trucks soon after the work started in November 1942. He then received 12 more in January 1943. The defendant furnished the plaintiff probably the only equipment available but it was in remarkably poor shape. The trucks had received heavy use on previous jobs and were in what can be best described as simply a worn-out condition. There is no record that the plaintiff complained about the condition of the trucks when received or that had he done so it would have helped matters. Extensive breakdowns occurred. The plaintiff had to make repairs which increased his costs. The worn-out condition of the equipment reduced its efficiency and productive capacity approximately 50 percent. Inability to find repair parts easily and the efforts made to do so increased plaintiff’s costs, also, and necessitated a time *464 extension. The plaintiff’s total expense in repairing and attempting to repair amounted to approximately $117,000. The defendant insists that the trucks were misused by the plaintiff and that, specifically, breakdowns occurred because of the plaintiff’s failure to furnish adequate haul roads, the plaintiff’s poor repair facilities, use in soggy ground and overloading. There is no doubt but that the plaintiff subjected the trucks to heavy use under difficult job conditions. It is not established that these conditions, or the condition of the trucks and the plaintiff’s losses therefrom, resulted because of fault and negligence on the part of the plaintiff.
48. In performing the contract, the plaintiff incurred increased labor costs over and above that which he had anticipated. He was unable to obtain adequate labor. The project was located on the Gulf of Mexico far from sources of good labor and the plaintiff was limited in territory from which to draw labor.
Poor housing facilities, shortage of food and bad living conditions in the vicinity caused a great turnover in labor. Some of the employees had to travel as far as 60 miles from the job site to find housing facilities. The plaintiff was compelled to employ Negro and Mexican labor who were untrained and unskilled in the type of work they were doing and at times the plaintiff was compelled to use women as truck drivers in order to attempt to keep up his progress schedule. It was difficult to obtain competent truck drivers. This type of labor increased the plaintiff’s costs. The plaintiff had an average of 300 men on the payroll during the construction period, but during the whole time he was on the project he had 1,500 employees to whom he issued badges, which shows that his labor turned over five times while he was on the job.
The plaintiff made an investigation of the labor' situation prior to entering the contract and determined that the supply of labor would be available. The defendant also made an investigation at the time it prepared its estimate and determined that the labor supply would be adequate and that there would be no scarcity of labor. The inexperience of the operators contributed to numerous breakdowns of the equipment.
*465 49. The plaintiff began operations at Palacios on or about November 14, 1942. The completion date set by the contract was January 29, 1943, and the plaintiff actually completed the work at Palacios on June 27,1943. However, as noted previously, the plaintiff was given a time extension of 134 days.
The site of the airfield at Palacios was an old rice field, the elevation of which was only a few feet above sea level and which was adjacent to the Gulf of Mexico. Immediate control of the water problem was essential. The plans and specifications called for catch-basins and storm sewers to be built under the runways and the plaintiff, of necessity, had to do this before any embankment work could be done.
50. As noted in finding 44, the drainage plan at Palacios consisted not only of a system of sewers and catch-basins on the airfield proper but also a perimeter drainage ditch which followed a course around the field’s northeast and north boundaries. This perimeter ditch ran from approximately the center of the eastern boundary of the field up to the northeast corner and thence west along the north boundary of the field. Two natural drains merged in the northeast portion of the field and, until grading started north of the runway system, the natural drainage ditch handled the flow. When the embankment for the north-south runway at the north end was completed, it stopped the drainage, in part, and it was stopped completely by dirt put into the natural ditch from grading operations on the northwest portion of the field.
While the plaintiff was constructing the artificial storm sewer drainage system it was using its other available equipment for stockpiling gravel and sand for the runways. The plaintiff also started right to work on the embankment for the north-south runway as soon as possible. In order to do so the plaintiff obtained the fill for the south end of the runway from the area where the perimeter ditch would be later. This made possible a short haul. This dirt was thus obtained from an area on the east side of the north-south runway and at the upstream end of the perimeter ditch area. When the rains came the effect of what had been done in working at the south end of the runway was to have *466 created a block across the natural drainage draw which entered the field from the east, thereby causing the formation of a large pond east of the north-south runway. This pond was known to the people on the job as “Lake Jake” or “Lake Ullery” after the plaintiff’s superintendent who directed the construction of the embankment. Had the rains not been unseasonal and had the plaintiff had sufficient equipment to dig the perimeter ditch or at least a pilot ditch, while at the same time doing other things necessary at the beginning of the job, such as stockpiling aggregates and putting in the storm sewer and catch-basis system, this unhappy event would not have occurred. As it was, the accumulation of water inundated some of the equipment and caused added expense and difficulty in operations. The plaintiff had to pump out the water.
The defendant did not instruct the plaintiff to proceed in this way, and the plaintiff had no plan of operations which is in evidence or which was upset by the defendant. However, the plaintiff’s actions, as herein described, did not constitute fault or negligence but were errors in judgment such as could have been made by any competent contractor who failed to anticipate the rainfall properly and who had poor and limited equipment.
COUNTERCLAIM
51. The plaintiff, A. J. Spicer, owes the United States taxes in the sum of $18,815.45, plus interest, as provided by law. Spicer Construction Co., Inc., a corporation, owes the United States taxes in the sum of $7,737.74, plus interest, as provided by law.
The above taxes have no relation to the performance of these contracts. It is, nevertheless, agreed that judgments may be entered against A. J. Spicer and Spicer Construction Co., Inc., respectively, for the amounts stated above, and that said amounts may be withheld from any amount the plaintiff is entitled to and does recover.
Spicer’s, Inc., a corporation, owes the United States $33,006.66, plus interest, as provided by law, for Federal unemployment taxes, Federal Insurance contribution taxes, *467 and withholding taxes for the period April 1,1945, through 1948. These taxes have no direct relation to the cost of performing the contract work involved in this suit.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the decision herein, the court concludes that as a matter of law plaintiff is entitled to the sum of $274,846.98 in settlement of his claim.
The court further concludes that as a matter of law defendant is entitled to recover on its counterclaim of and from the plaintiff eighteen thousand eight hundred fifteen dollars and forty-five cents ($18,815.45) for taxes, together with interest as provided by law, and to recover from Spicer Construction Co., Inc., seven thousand seven hundred and thirty-seven dollars and seventy-four cents ($7,737.74) for taxes, together with interest as provided by law, these amounts to be withheld from the amount that plaintiff is entitled to recover. Therefore, pursuant to Section 6 of the Lucas Act, 60 Stat. 902, as amended by 62 Stat. 869, 922, the Department of the Army is directed to settle such claim in the amount of two hundred seventy-four thousand eight hundred forty-six dollars and ninety-eight cents ($274,846.98) minus the amounts due the defendant on its counterclaim as set out above.